```
         UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF NEW HAMPSHIRE
```

Milford-Bennington Railroad Co., Inc.
& Peter Leishman

   v.                                     Case No. 10-cv-00264-PB
                                              Opinion No. 2011 DNH 206

Pan Am Railways, Inc., et al.

**MEMORANDUM AND ORDER**

Milford-Bennington Railroad Co., Inc. ("MBR") alleges that Pan Am Railways, Inc. ("Pan Am") violated its implied contractual duty of good faith and fair dealing when it excluded MBR's employee, Peter Leishman, from operating on its tracks. Pan Am has filed a motion for summary judgment, and for the reasons set forth below, I grant that motion.

## I. BACKGROUND

**A. The Trackage Rights Agreement**

On June 2, 1992, MBR entered into a Trackage Rights Agreement ("TRA") with the predecessors of Pan Am, securing for itself the right to operate its trains over an approximately three-mile stretch of track now owned by Pan Am. The TRA enabled MBR to haul stone from the quarry of its single customer, Granite State Concrete, to a processing plant in

Milford.  Although by its terms the TRA expired in June 2004, both parties agree that its provisions continue to govern their relationship.

The TRA requires MBR to comply with all federal and state rules and regulations, as well as the operating rules and regulations of Pan Am.  Two provisions govern potential rules violations.  The first pertains to investigations and hearings:

> In the event [Pan Am] conduct[s] an investigation or hearing concerning the violation of any operating rule or practice of [Pan Am] by any employee or employees of MBR, MBR shall be notified in advance of any such investigation or hearing.  Such investigation or hearing shall be conducted by [Pan Am], and may be attended by any official designated by MBR and shall be conducted in accordance with the collective bargaining agreements, if any, that pertain to said employee or employees.
>
> [TRA § 1, ¶ k, Doc. No. 57-3.]

The second provision pertains to the consequences of a violation:

> [Pan Am] shall have the right to exclude from the Trackage any employee of MBR determined by [Pan Am], as a result of such investigation or hearing described above, to have violated [Pan Am]'s rules, regulations, orders, practices or instructions.
>
> [Id. § 1, ¶ l.]

**B.  The Accident**

On October 22, 2009, Peter Leishman, the founder of MBR and one of MBR's two full-time employees, was at work on a moving train when it collided with a truck at a rail crossing.  At the time of the accident, Leishman, who was serving as the train's conductor, was located in a "control car" at the train's leading end, and the locomotive was pushing the train from its trailing end.  Transcript of July 1, 2001 Hearing at 4-9, 42-43, Doc. No. 54.  Although the control car was equipped with breaks, lights, bells, horns, and a whistle, the train's engine could be controlled only by an employee stationed in the locomotive.

Shortly after the accident, a Pan Am investigator filled out a Federal Railroad Administration form titled "Initial Rail Equipment Accident/Incident Record."  The report states that the primary cause of the accident was the truck's failure to stop at the crossing in violation of traffic laws.  FRA Initial Rail Equipment Accident/Incident Record, Doc. No. 60-17; FRA Guide for Preparing Accident/Incident Reports at 11, Doc. No. 60-18.  The report did not suggest that Leishman had violated any safety rules.

**C. Pan Am's Hearings**

Pan Am mailed a notice to Leishman on November 4, 2009, informing him that it would hold a hearing on November 10 "to develop the facts" of his involvement with the collision. Doc. No. 57-4. Leishman states that he received the letter on November 6, and requested that the hearing be rescheduled so that his counsel could attend. Declaration of Peter Leishman ¶ 6, Doc. No. 60-2. Pan Am refused to reschedule the hearing, however, and Leishman did not attend.

Pan Am did not immediately announce the results of its investigation into Leishman's role in the accident. Nevertheless, when Leishman attempted to engage in the first train run of the season on March 17, 2010, a Pan Am dispatcher refused him access to its tracks, citing "company policy" as the reason. Id. ¶ 9. Leishman contacted Bob Burns, counsel for Pan Am, who suggested meeting to discuss a new TRA. Id. On March 19, Leishman discussed that possibility with Pan Am representatives. Id. On April 8, Burns wrote a letter to Leishman proposing the terms of a new agreement. Burns Letter, Doc. No. 60-20. Leishman states that he called Burns on April 9 to reject the offer, explaining that the minimum car volume of

4

Pan Am's proposal was too high.  Declaration of Peter Leishman ¶ 10, Doc. No. 60-2.

The same day Leishman rejected the offer, Pan Am sent a letter informing him of the resolution of its accident inquiry. The letter explained that based on evidence adduced at the November 10 hearing, Pan Am had concluded that Leishman "was not properly stationed for the backward move through the crossing." See Pan Am Letter at 1, Doc. No. 57-5.  Leishman had thereby violated NORAC[1] Rules 116 and 138(e), which, as discussed in more detail infra, establish certain safety requirements for trains that are being operated from other than the leading end.  See id.  Accordingly, Pan Am invoked its authority under the TRA and decided to bar Leishman from operating on its tracks.  Id. at 2.

On April 14, Thomas Brugman, a section chief of the Surface Transportation Board, sent an email to Pan Am expressing concern about the interrupted rail service to Granite State Concrete and Pan Am's possible denial of due process to MBR and Leishman in its safety investigation.  Thomas Brugman Email, Doc. No. 60-22. By a letter dated April 28, Pan Am informed Leishman that it

---

[1] The acronym is short for Northeast Operating Rules Advisory Committee.  [Explain why Rule 138(e) is deemed to be a Pan Am safety rule.)

would hold a supplemental hearing "to further develop the facts" of his involvement with the collision. Notice of Supplemental Investigation at 1, Doc. No. 57-7. The hearing was scheduled for the morning of May 7, but Leishman did not receive the letter until late afternoon on May 6. Corey Lynch Letter at 2, Doc. No. 60-23. He was nevertheless able to attend with counsel. At this second hearing, Leishman complained of the lack of procedural guidelines for the hearing, the hearing officer's refusal to receive into evidence a written statement, and his own lack of opportunity to review newly provided information. Following this hearing, Pan Am again concluded that Leishman had violated safety rules and should be excluded from the tracks.

**D.  The Litigation**

In June 2010, MBR brought suit in Merrimack County Superior Court. Although MBR's initial complaint was less than a model of clarity, it became clear during the course of the litigation that it was claiming that Pan Am had acted improperly in invoking its power under the TRA to exclude Leishman from its tracks because: (1) Leishman had not violated any safety rules; (2) Pan Am had failed to provide Leishman with the process he

6

was due under the TRA; and (3) Pan Am breached the implied duty of good faith and fair dealing it owed MBR under the TRA by imposing an unreasonably harsh penalty on Leishman for his alleged violation of safety rules.  Transcript of July 1, 2001 Hearing at 13, Doc. No. 54.  On July 6, defendants removed the matter to federal court.  On September 29, the suit was stayed when the parties agreed that Pan Am would hold a third hearing.

The hearing took place on October 29, 2010.  Leishman was permitted to introduce evidence and examine witnesses, although MBR complains that the hearing officers cut off lines of questioning and did not accept certain evidence.  On December 7, Pan Am issued its decision and concluded yet again that Leishman would be barred from its tracks because he had violated Rule 138(e).

On July 1, 2011, I conducted a hearing to construe the NORAC rules and to interpret relevant provisions of the TRA. NORAC Rule 138(e) is titled "Trains Operated from Other Than the Leading End at a Highway Crossing," and reads:

> Trains being operated from other than the leading end must not enter a highway crossing at grade until on-ground warning is provided by a crew member or other qualified employee, except when it is visually determined that:

> 1. Crossing gates are in the fully lowered position, and are not known to be malfunctioning, or
>
> 2. A designated and qualified employee is stationed at the crossing and has the ability to communicate with trains, or
>
> 3. At highway and private crossings equipped only with flashing lights or X-bucks, it is clearly seen that no traffic is approaching or stopped at the crossing, and the leading end of the movement over the crossing does not exceed 15 miles per hour.
>
> [Pan Am Bulletin Order, Doc. No. 57-6].

MBR conceded at the hearing that its train was not being operated from the "leading end" when the accident occurred. Transcript of July 1, 2001 Hearing at 44-45, Doc. No. 54. It also agreed that no MBR employee had provided an "on-ground warning." Instead, it argued that Leishman had complied with Rule 138(e) because Leishman, who was riding in the lead car of the train during the accident, was "stationed at the crossing" at the time of the accident.

I rejected MBR's reading of the TRA and instead concluded that an employee is not "stationed at the crossing" under Rule 138(e) if he is on a moving train. Id. at 64. Accordingly, I concluded that Pan Am was entitled to exclude Leishman from its tracks under the TRA because he had violated a Pan Am safety rule. Id. At the same time, I determined that Pan Am had

8

provided MBR with the process it was due under the TRA. Id. at 97. Thus, the only claim that remains unresolved after the July 1, 2011 hearing is MBR's good faith and fair dealing claim. Pan Am now challenges that claim in a motion for summary judgment.

## II.  STANDARD OF REVIEW

A summary judgment motion should be granted when the record reveals "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The evidence submitted in support of the motion must be considered in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor. See Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).

A party seeking summary judgment must first identify the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted." Ayala-Gerena v. Bristol Myers-Squibb

Co., 95 F.3d 86, 94 (1st Cir. 1996); see Celotex, 477 U.S. at 323.

### III.  ANALYSIS

MBR alleges that Pan Am breached its obligation of good faith and fair dealing by imposing an excessive penalty for Leishman's safety violation.  It also suggests that Pan Am failed to act in good faith because it excluded Leishman from the track to obtain an advantage in negotiations over an extension of the TRA rather than to redress a legitimate safety concern.

Every New Hampshire contract includes an implied covenant that requires the parties to act in good faith in their dealings with each other.  Richard v. Good Luck Trailer Court, Inc., 157 N.H. 65, 70 (2008).  This duty of good faith and fair dealing takes several forms that can be grouped into three general categories, "the first dealing with conduct in contract formation; the second addressing termination of at-will employment contracts; and the third dealing with the limitation of discretion in contractual performance."  Great Lakes Aircraft Co. v. City of Claremont, 135 N.H. 270, 293 (1992).  MBR's claim falls into the third of these three categories.

The New Hampshire Supreme Court has explained that contractual discretion can be exercised in a way that violates the duty of good faith and fair dealing only if "a promise [is] subject to such a degree of discretion that its practical benefit could seemingly be withheld." Centronics Corp. v. Genicom Corp., 132 N.H. 133, 144 (1989) (Souter, J.). A leading treatise further explains that

> [discretion] arises whenever a legal directive or contract term is indeterminate because it fails to identify a single specific action that is legally permitted, prohibited, or required under the circumstances.  When expressly agreed contract terms leave a party with discretion, one party might act in performance of the contract, believing the act to be allowed while the other believes that act to be disallowed.  In the ensuing dispute, no resolution may be possible based solely on the agreed contract terms.
>
> [Steven J. Burton & Eric G. Andersen, Contractual Good Faith, § 2.3.2.1 at 45 (1995).]

Although the implied duty of good faith and fair dealing can limit a party's discretion in certain circumstances, the duty does not abrogate the principle that "[p]arties generally are bound by the terms of an agreement freely and openly entered into, and courts cannot make better agreements than the parties themselves have entered into or rewrite contracts merely because they might operate harshly or inequitably."  Mills v. Nashua

11

Fed. Sav. & Loan Ass'n, 121 N.H. 722, 726 (1981). Stated differently, "courts may not use the duty of good faith and fair dealing as a basis for rewriting a contract's plain terms." Marker Volkl USA, Inc. v. Outdoor Outlet, LLC, No. 10-C-0466, 2011 WL 2173797, at *4 (E.D. Wis. June 2, 2011) (applying New Hampshire law). Accordingly, the duty of good faith and fair dealing ordinarily does not come into play in disputes between commercial actors if the underlying contract plainly spells out both the rights and duties of the parties and the consequences that will follow from a breach of a specified right.

A survey of the New Hampshire Supreme Court's decisions on the subject demonstrates that the court will not find a breach of the duty of good faith and fair dealing merely because a party has invoked a specific, limited right that is expressly granted by an enforceable contract.[2] E.g., Olbres v. Hampton Coop. Bank, 142 N.H. 227, 232-33 (1997) (party did not have to

---

[2] I have not incorporated into my analysis the bright line rule set out by the court in Hobin v. Coldwell Banker Residential Affiliates, Inc., which held that the duty of good faith and fair dealing limits discretion in contract performance only if the contract would otherwise be rendered illusory and unenforceable for lack of adequate consideration. 144 N.H. 626, 630-31 (2000). The court was applying California law in Hobin and it has not relied on the reasoning of that decision in subsequent cases governed by New Hampshire law.

refrain from setting off bank account funds against loan balance where contract expressly granted that right without limitation); Centronics, 132 N.H. at 144-45 (party had no duty to approve early payment of uncontested portion of escrow funds where contract expressly governed the timing of the payment); accord Marker Volkl, 2011 WL 2173797, at *12-13 (applying New Hampshire law, and holding that duty of good faith and fair dealing did not override express contractual right to terminate at will). The present case is indistinguishable from this well-established body of precedent.

The express language of the TRA granted Pan Am a limited right in a clearly defined circumstance: Pan Am "shall have the right to exclude . . . any employee of MBR determined . . . to have violated" an applicable rule or regulation. The right is not premised on a discretionary determination,[3] but on a clear standard -- violation of an enumerated rule -- that is subject to empirical demonstration. Pan Am's option to invoke that

---

[3] This would be a different case if Pan Am's accrual of the right to exclude was based on, for example, a unilateral determination by Pan Am that an employee was "operating trains in a dangerous manner." With that as the operative language, the duty of good faith and fair dealing may have required Pan Am to interpret the undefined standard in a manner that would not frustrate the purpose of the contract.

right against a rule-violating employee was part of its bargained-for consideration, and nothing about Pan Am's exercise of discretion exceeded the bounds of precisely what was contemplated by the parties. Thus, Pan Am's decision was not one where, "in the absence of some good faith limitation," it would have "authority to deprive [the other party] indefinitely of a portion of the agreed consideration." Centronics, 132 N.H. at 145. MBR simply had not contracted for the right to have any employee –- regardless of a serious violation of train-safety rules -- utilize Pan Am's trackage over Pan Am's objection. MBR cannot complain, therefore, of any discretionary action by Pan Am by which it was divested of its expected benefits under the contract.

My decision is reinforced by assessing the apparent purpose of the exclusion provision. It gives Pan Am a specific recourse (i.e., exclusion of offending employee) against MBR in the event of a particular detrimental action (i.e., rule infraction showing unsafe operation of trains). The threat of that recourse serves as an incentive for MBR not to engage in the detrimental conduct. To limit Pan Am's recourse in this

situation would be to infringe on the incentive scheme agreed upon by both parties.

MBR could have negotiated for a different scheme, such as a progressive discipline regime or a neutral arbiter to make exclusion decisions. It did not, however, and it presumably received consideration in return. MBR now asks this court to relieve it from the harshness of the bargain that it freely struck. I decline to do so. To intervene and deprive Pan Am of its contractual right would be an unwarranted judicial interference with the ability of parties to contract. As the New Hampshire Supreme Court has admonished, "courts cannot make better agreements than the parties themselves have entered into or rewrite contracts merely because they might operate harshly or inequitably." Mills, 121 N.H. at 726.[4]

---

[4] MBR also argues that Pan Am breached its duty of good faith and fair dealing by failing to accord Leishman sufficient process in its hearings, thereby denying him the ability to meaningfully contest whether he was in violation of the safety rule at issue. The argument is untenable in light of my prior ruling, wherein I construed Rule 138(e) and determined that, according to the undisputed facts, Leishman was not in compliance. In any event, the record demonstrates that Pan Am provided far more process than expressly required by the agreement. Whereas the TRA does not even obligate Pan Am to conduct a hearing before exercising its right to exclude, see TRA ¶ 1, Doc. No. 12-3, Pan Am's third hearing, for which Leishman concedes he was provided timely notice, provided a forum for Leishman and his attorney to put on

## IV. CONCLUSION

I do not condone Pan Am's conduct in this case. While there is a reason to doubt Pan Am's claim that it invoked its right to exclude Leishman from its tracks solely because of public safety concerns, the contract plainly gives it the right to act as it did, regardless of its motive for doing so. Under the circumstances, MBR cannot rely on the duty of good faith and fair dealing to restore a right that it bargained away by agreeing to the TRA.

For the foregoing reasons, I grant Pan Am's motion for summary judgment (Doc. No. 57). The clerk is directed to enter judgment accordingly and to close the case.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

December 16, 2011

cc: Craig S. Donais, Esq.
Christopher H.M. Carter, Esq.
Michael J. Connolly, Esq.
Seth Michael Pasakarnis, Esq.

---

a full defense, including the opportunity to introduce relevant evidence and examine witnesses.

16